Case number 20-5007. Brad Steele, abelant, versus Lloyd J. Austin III in his official capacity as Secretary of Defense. Ms. Rucker, ready abelant. Ms. Lyons, ready abelant. Morning, Council. Ms. Rucker, please proceed when you're ready. Ms. Rucker, can you hear us? Oh, can you hear us now? OK, please proceed when you're ready, Ms. Rucker. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I am Donna Rucker, and I'm here on behalf of Dr. Brad Steele. And we have brought this appeal because we believe that the trial court, in presenting its findings of facts and conclusions of law, can be reversed under the circumstances in this record, even under the deferential standard, because it's clearly erroneous. And we also believe that Dr. Steele proved that, but for his age, he would not have been issued the termination notice in this particular case. As the Court knows, one way of showing the clear error standard is to show that the lower court ignored evidence that contradicts its credibility assessments. We're clearly not saying here that making credibility assessments was not something that the Court could do. What we are saying is that, in this particular case, the Court erred because it is not well-grounded in fact and law, or logic, rather, in terms of what the findings of facts and conclusions of law offered. It ignored contrary evidence, and it took positions that were illogical and implausible, and it rested upon internally inconsistent reasoning. And with those facts, or the factors proven, this Court may reverse, even under the deferential standard of review. So specifically, with respect to not well-grounded in fact and logic, when you look at- Ms. Rucker, excuse me, if I may, just before you get into your arguments based on the findings and the evidence. In terms of the standard, the standard for liability, there's the but-for standard for full relief and the a-factor standard for only forward-looking relief. And I take your case to be invoking the but-for standard and not, in the alternative, the a-factor standard. That's how the case was tried, and that's how your appeal brief, and particularly the reply brief, clarifies. Just to confirm, that's correct? That is confirmed, Your Honor. And in mentioning the issue of the it is tainted, we do understand the Court did not have to reach that, given the position that we took in presenting our case. But it clearly shows that, from this record, there were considerations. But the judge, of course, was looking at the but-for standard. So when we look at the fact that this was not well-grounded in fact and logic, we must turn to Colonel Bell. And Colonel Bell offered, during the course of this trial, a lot of information pertaining to budgets, budget cuts, state versus DOD across the board budget cuts, and pontificated and offered that this is now why Dr. Steele had to be released. But we cannot ignore the record in this case, and we should not. Because when you look at Colonel Bell, he says, specifically on this record, that when he made the decision to release Dr. Steele, he did so in reliance on the academic leadership. And so what is the significance of that? Well, if you're relying on the academic leadership, we have to look at who that is. And in this particular case, that would be Dr. Bolanos and Dean Hanlon. And so when we look at what has been offered and rationalized in this particular record, which is the wonderful recitation of the budget situations, what had to happen, and what needed to occur, we cannot overlook the fact that that is Colonel Bell offering that, allegedly, as to what he did in making this decision. But he clearly relied on academia. And so what happens next is, during the course of this case, there is an effort to argue and therefore withdraw Dr. Bolanos, who is Dr. Steele's first-line supervisor, from the discussions and considerations regarding whether to fire him. It is illogical. Even though we know on this record, Dr. Bolanos says, I didn't have any involvement, what contradicted that is that, at the administrative level, she indicates that there was an involvement in the decision to fire. And what Judge Mehta does, the lower court does, is simply says, I don't find that to have impacted or affected her credibility in this particular case. Those statements do not have the ability or didn't have the effect of reducing his credibility assessment of her. However, in this particular case, there's also much talk about Dr. Steele not being found to be credible because he allegedly embellished his testimony. However, this record shows that Dr. Steele specifically indicated during the administrative record in this case, as well as during the deposition that was held in this case. He referenced the fact that there was this African-American woman who had brought a race discrimination case and that she ended up having to be brought back because, or was brought back because of a EEO complaint or something of the sort filed. So it isn't correct that he embellished and mentioned for the quote, first time, these things. There is also in his deposition testimony where he is being questioned, he clearly talks about Dr. Bolanos referring to older people as cantankerous. And so it isn't so that there was an embellishment. And even to the extent that the lower court wanted to conclude that there was some embellishment, how do you disregard and find overall Dr. Steele, who has been litigating this case for years, somehow or another was not truthful about anything that Dr. Bolanos said. Most importantly, when you look at this analysis of the alleged embellishment, what you also see is that you don't have that same analysis when you look at incorrect statements or impeachment scenarios of the other witnesses. It's simply, yes, they were impeached, but I don't find that affected their credibility. But why? That's how it's not well grounded in logic and in fact. It also ignored contrary evidence. So what we have, for example, is the discussion about Dr. Steele and why he is gone. Dean Hanlon actually says on this record that he was let go because there were issues with the Fort Bragg billet. That is what's stated. So if it's the Fort Bragg billet, then it can't be the overall DOD cuts that Colonel Bell offers as to why he had to make the decision. And as we know, Dr. Bolanos said that Dr. Steele was just not a good fit. Well, if we're talking budget, we are not talking about whether someone is a fit at all. I had a question about that, Ms. Rucker. The notion that you accurately reflect our law about conflicting or shifting explanations, potentially raising an inference of pretext. But I'm not sure that I see the conflict. If an academic or any employer is facing a budget cut and then they have to choose people to let go, seems like it's a sort of consistent but subsidiary factor what the various potential layoffs bring. And so rather than being impugning or somehow undermining the validity of the principal rationale, which is budget cuts, I'm not sure why we should infer from the additional evidence about small but nonetheless noticed issues or features of Dr. Steele's performance that that would detract from the credibility of the principal reason. So I'm not suggesting that it isn't. I'm just saying that at this particular point, when we get to this trial, there have been so many reasons offered. And I do understand that in academia, you do want to look at performance and other issues. But when you realize the fact that they actually said, meaning they, meaning the academia, first of all, Bolanos tries to say I wasn't involved. But through impeachment, she clearly was involved. And then Dean Hanlon tries to say that he wasn't a good fit. Excuse me, Dr. Bolanos said he wasn't a good fit, which says that she's talking about something other than performance. And you have to look at the provost's letter, where that letter goes out and says, I think you made the right choice with Dr. Steele. Well, we're not talking a choice if it's really budget. And so I think those kinds of things kind of have to be looked at. And also, Dr. Bolanos, in her EEO testimony, said it had nothing to do with budget, and so budget cuts. And so you can't overlook, when I say shifting explanations, it's just trying to hit a particular target. And I think in this particular instance, the fact that Colonel Bell said that I relied on the academia, the academic leadership, I think what happens here is we don't then get to give the weight that Judge Mata gives to Colonel Bell's reasoning. Because he said, I relied on what they told me. And Dean Hanlon admits that she told him, get rid of Dr. Steele. And so when you look at Dean Hanlon, what you have is Dr. Blau, who has nothing in this situation. I see my time has ended, and I'll be happy to come back and talk on my rebuttal time. Thank you, Your Honors. Thank you, Ms. Rucker. Ms. Lyons, we'll hear from you now. Thank you. Good morning. Jane Lyons on behalf of the Secretary of Defense Lloyd Austin. May it please the court. The evidence this court had suggested at summary judgment could plausibly support finding age discrimination was entirely discredited by the district court sitting as the finder of fact at trial. The district court fully credited the explanations given for letting Dr. Steele go during his probationary year, as well as evidence of positive employment actions taken for older professors by the same actors. The findings of fact we submit preclude finding liability for age discrimination under any recognized standard. But as appellant has conceded this morning that the case has only been presented as a sort of single motive, to use the Title VII lingo, that's the single motive, then that is all that this court need to consider. And that is the standard that the district court applied in concluding that there was no age discrimination. I would like to make a couple of points in response to my friend on the other side, whose arguments largely depend on disregarding the credibility determinations and reweighing the evidence in a cherry-picked kind of way. One of the things I would like to point out is that this court's review of this case at this point is limited to the trial record. And the credibility determinations by the district court are based not insignificantly on the demeanor of the witness. Additionally, the suggestion that other evidence of corroboration of the need for budget cuts and how those relate to the decision goes largely to credibility. The idea that there are shifting explanations here is incorrect. What the trial record shows is that budget cuts of the DOD caused there to be a directive to cut three faculty members. And so that's what sets a process in motion. The process was described extensively by Dr. Bell and his effort to get a waiver of the requirement for cutting any faculty members. But when that didn't come through, he had to choose from — they decided to choose only from among the probationary employees. Two went out pretty quickly and pretty easily because their funding for their positions at the State Department had been cut. And so then Dr. Bell had to select from four remaining faculty members who to pick. And notably, although two younger professors than Dr. Steele were not cut, an older professor, a significantly older professor, Dr. Parker, was retained. Can I ask you, Ms. Lyons, on the — the district court, you know, found that Dr. Steele's contract was terminated because of budget constraints and position cuts. But there were also hires going on at the same time. And I wonder if you can identify — I don't think the district court, in its opinion, really grapples with that evidence that the college was hiring new employees simultaneous with the process of selecting who to cut and terminating Dr. Steele. Can you walk us through how that doesn't under — you know, undercut the claim of budget — that budget cuts were a reason that they had to let go of Dr. Steele? Yes, Your Honor. These events are not all ongoing simultaneously. And I think it's worth pointing out that Dr. Steele testified that he hesitated to take the job in the fall or late summer of 2010 because he acknowledged that there were growing recession concerns and indications of a lot of possible cutbacks at the Department of Defense. He testified those were obvious concerns for him. So that's the environment in which his relationship with the college begins. And the rumblings and the rumors about this need to cut three faculty members arises in the fall, at the same time that the college is also being required to implement a new program entirely focused on Afghanistan and Pakistan. So there are competing dynamics there. And then Dr. Bell requests a waiver from the DOD, and he believes — he testified that he believed, through the winter, and that Admiral Rondeau, also above him, believed that that waiver would be granted. And then when it wasn't, they had to go through the process of picking three faculty members to eliminate, to comply with that directive. And then that decision was made and communicated to Dr. Steele on April 18th, 2011. And it was only later into the fall, late in the summer, early in the fall, when the National Defense University had some extra faculty positions that they were not using that were then reallocated to the college. And it isn't then that they go ahead and hire a couple of more professors. If you zero in just a little bit more specifically, and just help us understand, there are some emails in the record where Dr. Steele mentions that, in June, he was aware that people had already been or were being interviewed. And so it is back in the spring when Dr. Steele is being terminated, that there's an ongoing process to identify new people to hire. And I just, the conflict between, if they think they're gonna have money, why aren't they thinking, well, instead of identifying new people, that might allow us to keep Dr. Steele. And I'm just not fully following the consistency that you see between planning to bring, I mean, I realized that they weren't brought on board until the fall, but planning to bring new people on board during a period when they're also finalizing the letting go of Dr. Steele. If you could just, in a little bit more concrete way, walk us through the timeline of that and how that is consistent, that would be helpful. There's a timeline, Your Honor, and you have that generally correct. And I don't dispute anything that you just said, but the important thing to recognize is that the timeline is not for a general hiring of new faculty, it is for a particular need that they have to hire experts in Afghanistan and Pakistan and counter terrorism. And the reason there are multiple things also going on with Dr. Steele, because his reaction to being terminated is part of what did not lead them to further consider him by the time they actually did the hiring. At the time they're doing some of the interviewing, there is very little evidence in the record about what else is in the applicant pool. And I think that would be a relevant fact to consider if we had it, of course we don't. So the reality is they are looking for particular specialties in this new program that they're going to have to stand up. And Dr. Steele is not an Afghanistan or Pakistan specialist, and he is not a counter-terrorism specialist. So he's not a natural fit. And by the time they're actually doing the hiring, he has basically eliminated himself from consideration, his own actions. This is not directly relevant, but just you may know the answer off the top of your head. If a institution like this that has short-term positions realizes if we get rid of this one person who's more senior, we can hire two people who are more junior, is that age discrimination or not? The fact that someone's more expensive and that you can actually get more employees, you may not know the answer. It's not been argued here. I'm just- It's an interesting hypothetical because it assumes a correlation between age and experience and higher pay, which may or may not be true on any given record. Right. I think in particular here, we have a record of Colonel Bell when he realizes that Dr. Parker is not paid as much. He goes ahead and gets him promotions. So I think yours hypothetical is interesting, but it's much harder to apply on this record. I don't want to eat up your time if you have other points you want to make. I have one quick follow-up on your answer to Judge Pillar previously, which is you'd said that Dr. Steele, by the time that the three younger people came on board, he'd largely removed himself from consideration. So at that point, that's not a budgetary reason. If I'm understanding correctly, because the reason stated for why he wasn't retained is for budgetary reasons, but then- Well, there's a lot of evidence in the record, Your Honor, if I may, just that the budgetary and the full-time equivalent positions and the budgetary issues are connected in ways that are quite complicated. So it was the requirement that they eliminate the three full-time faculty positions in the spring that led to Dr. Steele being let go. And if I understand your question correctly, maybe I don't, but perhaps you could ask me again. Right, well, at the end of the response to Judge Pillar, you'd said that by the time the three, I guess that would be Gresh, Pakavola, and Miser, by the time they came on board, Dr. Steele had largely removed himself from consideration. I think I heard you say that. Is that correct? Yes, Your Honor. That's correct. And so if he'd removed himself from consideration, then the reason that he wouldn't have been retained, that's not a budgetary... You don't remove yourself from consideration for budgetary reasons, that's something else. Well, at that point, he does not have an ongoing relationship with the college and there's no evidence in the record that he applied for any of the positions for which those individuals, two of them were selected as regular faculty and one was a contractor. Right, so if it's that he didn't apply, then that, do you mean he didn't, he removed himself from consideration by not even applying? I thought you were talking about something else. I mean, in two ways, he did not, his reaction to being let go and his conduct is what led the college to sever the relationship prematurely. And as an additional reason, he had not applied for consideration in these Afghanistan and Pakistan specific programs. All right, let me make sure my colleagues don't have additional questions for you, Ms. Lyons. No, thank you. Thank you. Ms. Rucker, we'll give you back two minutes for rebuttal. Thank you, Your Honor. At this particular point, I wanted to address something that the court pointed out and sort of honed in on, which is very critical to this case. At this particular juncture, when you're looking at in June, well before, you know, right in the midst of telling Dr. Steele in May that we have to let you go due to budgetary cuts. Now we have in June, an announcement to the faculty that we have these new people coming on. That is critical. It is inconsistent and that is exactly what we mean when we say that this decision is not well grounded in logic or fact. It has no basis to be supported and is subject to reversal for clear error. And when we also consider what the court asked in terms of the idea that well, let me just deal with the answer that was given is that there were hiring restrictions and that Dr. Steele somehow or another had taken himself out of contention. The court, the lower court actually dealt with this towards the end of the trial where it said, why didn't someone just tell him? So what is being referenced here about him taking himself out of contention is repeatedly trying to understand why is this happening to me? It is not logical. It makes no sense that someone who was heavily recruited such as Dr. Steele was would suddenly not be a candidate. And it also is this placeholder argument that we've been making is also present when you look at the fact that Dr. Steele rejected a Fort Bragg billet. Ultimately, he was obviously placed in that same one because they needed to hold that place but he was never going to stay because they were looking in June and then in fact brought people on who were younger to do and to keep people who taught the same courses he was teaching. And it is also very critical to point out that in Dr. Steele's talking about Mr. Uko and others, no one controverted the fact that he himself said that he was also qualified to do this work. It is uncontroverted. Even though these people may have had the ability to do this it still doesn't answer what this court asked at the beginning of Steele one which is even if you had to make cuts, why Dr. Steele? I believe that that's still been not answered. We ask for this decision to be reversed and that Dr. Steele receives all that he is entitled to under the law. And thank you, your honors for your time this morning. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Rao